**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JASON MICHAEL FRAZIER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 08-1585 |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| DAVID DIGUGLIELMO, *et al.*, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION

Petitioner Jason Frazier ("Petitioner") filed this Petition for Writ of Habeas Corpus on November 12, 2008. (Doc. 3 at 16-17). Petitioner challenges, under 28 U.S.C. § 2254, his 2001 conviction in the Court of Common Pleas of Allegheny County, Pennsylvania, on the charge of first degree murder, 18 Pa. Cons. Stat. § 2501, for which he currently is serving a sentence of life imprisonment without the possibility of parole. For the reasons stated below, this petition will be denied.

## I. The Crime

The facts presented at Petitioner's criminal trial were summarized by the Superior Court of Pennsylvania as follows:

> On July 3, 2000, Pittsburgh Police received a report indicating a male had been shot at while he was changing a tire along Bennett Street. When police arrived at the scene, they discovered [Petitioner] in a highly agitated and angry state. [Petitioner] told officers, "Somebody is going to pay for this." When asked whether he knew who had shot at him, [Petitioner] told police "Kelly Street is responsible for this."

On the early morning of July 4, 2000, Sherdina Jones was shot and killed near the 7500 block of Kelly Street. Upon arrival, police were able to retrieve eight shell casings from the crime scene. Shortly after the shooting occurred, police received an anonymous tip indicating the murder weapon had been hidden in a dumpster situated along the 7300 block of Frankstown Road. Police searched the dumpster and recovered a modified semi-automatic .22 caliber rifle loaded with nine live rounds in the clip . . . . Subsequent analysis established that the eight casings recovered from the crime scene were fired from the .22 rifle recovered from the dumpster. Subsequent analysis further established that the bullet fragments recovered from Jones' body also had been fired from the .22 rifle.

On July 5, 2000, a homicide detective investigating the case went to [Petitioner's] residence and, after discovering [Petitioner] was not home, impounded [Petitioner's] vehicle for inspection. After learning his vehicle had been impounded, [Petitioner] went to the East Liberty homicide office to recover it. When [Petitioner] arrived at the office, a detective questioned him about the shooting death of Jones. [Petitioner] claimed he had no idea who killed Jones and also told the detective he was not in Pittsburgh on the night of the shooting. On July 21, 2000, [Petitioner] returned to the homicide office a second time to get his vehicle out of impound. Once [Petitioner] arrived at the office, detectives placed him under arrest. [Petitioner] was charged with criminal homicide later that day.

On July 25, 2000, [Petitioner's] girlfriend contacted police and informed them that [Petitioner] wanted to meet with homicide detectives in his holding cell. The next day, detectives met with [Petitioner] at the Allegheny County Jail and issued [Petitioner] his Miranda warnings. Initially, [Petitioner] confessed to purchasing a .22 rifle at K-Mart and then modifying the weapon by cutting off the stock. [Petitioner] then told detectives that on the early morning of July 4, 200[0], he had been with a few friends at a cookout and, later, went with these friends to a hotel room. He told the detectives that upon leaving the hotel, he and a friend named Geoffrey Warren decided to follow Warren's female acquaintance to see whether she was involved with anyone else. The pair followed the female to Kelly Street. [Petitioner] told the detectives that when he drove onto Kelly Street he noticed three men hiding in some weeds. [Petitioner] said he then told Warren to duck and, immediately upon doing so, heard two shots ring out.

[Petitioner] told detectives Warren pulled out the .22 rifle and shot at the men in the weeds eleven times.

[Petitioner], however, quickly changed his story and admitted to detectives that when he turned onto Kelly Street he "felt something was about to happen" so he pulled out his .22 rifle, reclined the driver's seat, placed the rifle on the window sill, and shot eleven times in the direction of the three men hiding in the weeds. The detectives taped the interview and took notes. The detectives allowed [Petitioner] to review the notes at the conclusion of the interview and [Petitioner], after reviewing the notes, signed in five places.

PCRA Ap. Ct. Op. (Doc. 15-8 at 1-4) (internal citations to the record omitted).

A suppression hearing regarding Petitioner's taped confession was held on

January 11 and 12, 2001. See (Doc. 39).[1] At this hearing, the Commonwealth presented the

---

[1] A transcript of the suppression hearing was not provided by Respondents when they initially filed Petitioner's state court records with this Court in these proceedings. Indeed, it appears that the Superior Court did not have this transcript in its possession when it affirmed the trial court's dismissal of Petitioner's PCRA petition. PCRA Ap. Ct. Op. (Doc. 15-8 at 18). On March 28, 2011, Petitioner filed a motion to compel Respondents to produce this transcript. (Doc. 35). Given the obvious relevance of the transcript to this case, and presuming, without deciding, that it was at least arguably part of the "record before the state court" adjudicating Petitioner's claims on the merits, see Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011); see also PRCA Trial Ct. Op. (Doc. 15-5 at 10-11) (citing to the transcript of the suppression hearing), this Court attempted to obtain the document informally. When those efforts proved to be fruitless, Petitioner's motion was granted. See Text Order of October 12, 2011. Respondents filed the transcript on October 21, 2011. (Doc. 39).

Petitioner now objects to the transcript's inclusion in the record. Specifically, he notes that the copy of the transcript filed by Respondents is date-stamped October 21, 2011, and that the pagination differs from Petitioner's copy. (Doc. 43 at 2). In support of this, Petitioner attaches as an exhibit, an earlier copy of the transcript, which appears to have been in his possession for some time. See (Doc. 43-1). As a result, Petitioner moves that his petition be granted immediately. (Doc. 43 at 1).

Quite notably, Petitioner does not allege that the substance of the transcript has been changed in any way. To the extent that he argues that this Court might be "confused" by the differences in page numbers and spacing between words, the undersigned assures Petitioner that the entirety of (continued . . .)

testimony of various individuals, including the arresting officer, Detective McGee. Detective

McGee testified that, prior to Petitioner's appearance at the East Liberty homicide office on

July 21, 2000, a squad meeting took place. Id. at 54. At that meeting, McGee was informed by

other police officers that Donta Wilson[2] – a purported eyewitness to the shooting of Sherdina

Jones – had accused Petitioner of being responsible. Id. at 54-55, 70-71. A decision was made

at that time to arrest Petitioner, without a warrant, when he appeared at the homicide office. Id.

at 69-72. Based on the testimony at the suppression hearing, the trial judge held that Petitioner's

warrantless arrest on July 21, 2000, had been supported by probable cause, and that Petitioner

knowingly and voluntarily waived his Miranda rights when interviewed by the police on

July 25, 2000. Id. at 182.

Petitioner's criminal trial commenced at the conclusion of the suppression hearing on

January 12, 2001, and lasted until January 19, 2001, at which time Petitioner was convicted of

first-degree murder. Trial Tr. of Jan. 18-19, 2001, at 115. Plaintiff initially was sentenced to life

imprisonment without parole on January 19, 2001, almost immediately after the verdict was

rendered. Id. at 115-16. However, this sentencing order was vacated on January 23, 2001, and a

---

the transcript has been reviewed, and these superficial differences will not prejudice Petitioner in
any way. To the extent that Petitioner argues that the transcript has been "suppressed" by
Respondents, see id., the undersigned notes that the transcript is mentioned throughout the
record, and Petitioner appears to have had a copy in his possession throughout these proceedings.
Additionally, the relief requested by Petitioner – the immediate grant of the writ as a sanction for
Respondents' alleged withholding of this document – cannot be granted. A writ of habeas
corpus may be granted if an only if Petitioner makes the proper showing, as outlined by the
habeas statute. See 28 U.S.C. § 2254(b). Accordingly, Petitioner's motions relating to the
production of the transcript of the suppression hearing (Docs. 40, 42 and 43) will be denied.

[2] Throughout the record Mr. Wilson's first name has been spelled in various, inventive ways,
such as "Donte," "Dante," and "Donta." This Court adopts the spelling used by Petitioner in his
amended petition. (Doc. 21 at 21).

new sentence of life imprisonment without parole was imposed, in order to allow Petitioner to exercise his right of allocution.  See Sentencing Hr'g Tr.

Petitioner filed a post-sentence motion on January 30, 2001, which was denied by the trial court the following day.  Petitioner perfected a timely direct appeal, which was denied by the Superior Court on February 13, 2003.  See (Doc. 15-3 at 1-25).  *Allocator* was denied by the Supreme Court of Pennsylvania on July 24, 2003.  Id. at 28.

Petitioner timely filed a *pro se* petition for post-conviction relief, pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.*, on April 29, 2004.  Petitioner, with the aid of counsel, filed an amended PCRA petition on January 25, 2007.  This was denied by the trial court without an evidentiary hearing on August 30, 2007.  (Doc. 15-5 at 8).  Petitioner filed notice of appeal on September 11, 2007, and the trial court's decision was affirmed by the Superior Court on March 10, 2008.  (Doc. 15-8 at 20).  The Supreme Court of Pennsylvania denied *allocator* on August 25, 2008.  Id. at 23.  Petitioner executed the petition for writ of habeas corpus *sub judice* on November 12, 2008.  (Doc. 3 at 16).

**II.  Claims**

Petitioner raises the following claims for relief:

1.  The state court's determination that the presentation of character evidence was irrelevant and unwarranted was contrary to or an unreasonable application of federal law, or was based on an unreasonable factual determination.  (Doc. 3 at 17).  In his amended petition, Petitioner characterizes this as a deprivation of his right to due process under the Fourteenth Amendment to the Constitution of the United States.  (Doc. 21 at 16).

2.  Counsel at trial and on direct appeal were ineffective in failing to preserve and litigate Petitioner's claim that he was arrested without probable cause.  (Doc. 3 at 17); (Doc. 21 at 17-18).

3.  Trial counsel was ineffective for failing to request a mistrial due to comments made by the prosecutor, which Petitioner characterizes as the prosecutor's "personal opinion and beliefs about Petitioner's guilt and credibility."  (Doc. 21 at 18-19); (Doc. 3 at 17-18).

4.  The state court's finding that Petitioner's July 3, 2000, statements regarding "Kelly Street's" responsibility for a shooting on that date, as well as his statement that someone would pay for the shooting, were excited utterances, was contrary to or an unreasonable application of federal law.  (Doc 3 at 18).  In his amended petition, Petition further argues that this decision also was based on an unreasonable factual determination, and violated his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.  (Doc. 21 at 19-20).

5.  The state court's determination that an evidentiary hearing was not required regarding several affidavits obtained by Petitioner after his criminal trial was contrary to, or an unreasonable application of, clearly established federal law, and based on an unreasonable factual determination.  (Doc. 3 at 18-9).  In his amended petition, Petitioner characterizes this as a violation of his rights under the Sixth and Fourteenth Amendments.  (Doc. 21 at 21-22).

## III. Procedural Issues

Before this Court can address the merits of Petitioner's claims, it will briefly address whether this petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

## A. AEDPA's Statute of Limitations

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed under the one-year limitations period applicable to such petitions. In this regard, the federal habeas corpus laws impose a one-year limitations period applicable to state prisoners. 28 U.S.C. § 2244(d) (as amended). Respondents here concede that all of Petitioner's claims are timely under AEDPA's statute of limitations. (Doc. 13 at 10).

## B. Exhaustion

The provisions of the federal habeas corpus statute require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. 28 U.S.C. § 2254(b). Respondents concede that Petitioner's second and third claims – those alleging ineffective assistance of counsel – were properly exhausted before the state courts. (Doc. 13 at 12). However, they argue that claims 1, 4, and 5 are procedurally defaulted due to Petitioner's failure to raise them as federal claims in the state courts. Id. Rather than engage in a detailed analysis of whether these claims were indeed presented as federal law claims in the courts of Pennsylvania, this Court will presume, without deciding that they were exhausted, and proceed directly to their merits. See 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus

may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

## IV. MERITS

### A. Standard of Review under Section 2254

28 U.S.C. § 2254 allows a person in custody due to the judgment of a state court to seek a writ of habeas corpus based "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C. § 2254(a).

In describing the role of federal habeas proceedings, the Supreme Court of the United States noted:

> [I]t must be remembered that direct appeal is the primary avenue
> for review of a conviction or sentence. . . .  The role of federal
> habeas proceedings, while important in assuring that constitutional
> rights are observed, is secondary and limited.  Federal courts are
> not forums in which to relitigate state trials.

Barefoot v. Estelle, 463 U.S. 880, 887 (1983) (superseded by statute on other grounds as recognized in Slack v. McDaniel, 529 U.S. 473, 480-81 (2000)).

The AEDPA has further "modified a federal habeas court's role in reviewing State prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).  Amended section 2254 of the federal habeas corpus statute provides the standard of

review for federal court review of state court criminal determinations and provides, in relevant

part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1)

'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir.

2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Few state court decisions will

be "contrary to" Supreme Court precedent.  "'[C]learly established Federal law' should be

determined as of the date of the relevant state-court decision." Greene v. Palakovich, 606 F.3d

85, 87 (3d Cir. 2010).

The federal habeas court more often must determine whether the state court adjudication

was an "unreasonable application" of the Supreme Court's precedent.  "A state-court decision

'involve[s] an unreasonable application' of clearly established federal law if the state court (1)

-9-

'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Blackwell, 387 F.3d at 234 (quoting Williams, 529 U.S. at 407). It is important to note that this standard is different from finding that the state court applied clearly established federal law *incorrectly*. "The unreasonable application test is an objective one – a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Lambert v. Beard, 633 F.3d 126, 133 (3d Cir. 2011) (quoting Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005)). Instead, the application of the law by the state court must also be *unreasonable*. Lambert, 633 F.3d at 133. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006). Petitioner's claims will be reviewed in accordance with these standards.

**B. Application of the Merits Standard**

**1. Claims 1 and 4: Evidentiary Rulings**

Claims 1 and 4 are relate to evidentiary rulings made at Petitioner's criminal trial. Specifically, Claim 1 is based on the ruling of the trial court, made shortly prior to the prosecution resting its case, that Petitioner could not present testimony regarding his character for truthfulness and honesty. Trial Tr. of Jan. 1, 2001 at 43-46. Petitioner raised this claim on direct appeal, and the Superior Court denied it based on Pennsylvania Rule of Evidence 608(a), which states, in pertinent part that "evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by reputation evidence or otherwise." Pa. R. Evid. 608(a)(2); (Doc. 15-3 at 12-14). The Superior Court held that, while Petitioner's credibility had been attacked prior by the prosecution in its opening statement, the trial court had adequately cautioned the jury that they could not consider such statements as evidence. (Doc. 15-3 at 14) Additionally, that court determined that Petitioner's *character* for truthfulness was not at issue, as it was not relevant to the homicide, and was not attacked by reputation evidence or otherwise. Id. (emphasis added). In the instant proceedings, Petitioner raises this claim as a violation of his Fourteenth Amendment right to due process.

Claim 4 relates to the trial judge's ruling that Petitioner's statements regarding the responsibility of "Kelly Street" for a shooting on July 3, 2000, and his assertion that "[s]omebody [would] pay[,]" were admissible as excited utterances. Trial Tr. of Jan. 12-16, 2001 at 91-93, 114. At the trial, Officer Amoroso testified that Petitioner had made the above statements minutes after a shooting on July 3, 2000, of which he was the intended

victim. She also testified that Petitioner was "irate and agitated" during the entire period of time that she was in his presence on that date.  Id. at 115.  Like Claim 1, Petitioner raised this claim on direct appeal.  The Superior Court found that, pursuant to Pennsylvania law, the statement fell into the excited utterance exception to the hearsay rule.  (Doc. 15-3 at 10-12).  In the case at bar, Petitioner attempts to characterize the trial court's ruling on this issue as a violation of his due process rights under the Fourteenth Amendment, as well as his rights under the Confrontation Clause of the Sixth Amendment.

Habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Taylor v. Horn, 504 F.3d 416, 448 (3d Cir. 2007); Smith v. Horn, 120 F.3d 400, 426 (3d Cir. 1997).  Petitioner may obtain habeas review only of federal constitutional claims.  28 U.S.C. § 2254(a).  Claims of state court error in interpreting or applying state evidentiary rules, such as Pennsylvania's hearsay rule and its exceptions, are not cognizable here.  See Wells v. Petsock, 941 F.2d 253, 256 (3d Cir. 1991) ("We can take no cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule, even if that rule is intended as a guide to implicate a federal constitutional guarantee."); Bisaccia v. Att'y Gen. of New Jersey, 623 F.2d 307, 312 (3d Cir. 1980) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974)).

To the extent that Petitioner attempts to contort these state-law evidentiary rulings into purported violations of his constitutional rights, this Court will presume, without deciding, that such arguments were exhausted before the state courts.  As it is clear from the record that the

state courts did not address his claims as arising from the Constitution of the United States, this Court will apply *de novo* review.

The Court of Appeals for the Third Circuit has held that "evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." Bisaccia, 623 F.2d at 312. The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." Crane v. Kentucky, 476 U.S. 683, 689 (1986). That said, state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness. See Chambers v. Mississippi, 410 U.S. 284, 299-302 (1973).

With respect to erroneously admitted evidence

> To constitute the requisite denial of fundamental fairness sufficient to issue a writ of habeas corpus, the erroneously admitted evidence must be material in the sense of a crucial, critical, highly significant factor, and the probative value of the evidence must be so conspicuously outweighed by its inflammatory content that a defendant's constitutional right to a fair trial has been violated.

Peterkin v. Horn, 176 F. Supp. 2d 342, 364 (E.D. Pa. 2001). With respect to erroneously excluded evidence, Petitioner must demonstrate "[f]irst, that [he] was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose." Gov't of Virgin Islands v. Mills, 956 F.2d 443, 446 (3d Cir. 1992).

-13-

Petitioner simply has not made this showing with respect to Claims 1 and 4. First, for the reasons articulated by the Superior Court, it is clear that the trial court's rulings with respect to this evidence were correct under Pennsylvania law. See (Doc. 15-3 at 10-14). Second, the record does not indicate that the fundamental fairness of petitioner's criminal trial was in any way undermined by the exclusion or admission, respectively, of the evidence at issue. Thus, these claims are not cognizable on habeas review and will be dismissed.

Additionally, to the extent that Petitioner argues that the inclusion of his own statements under an exception to the hearsay rule somehow violated his rights under the confrontation clause, his argument is without merit. "The Sixth Amendment does not guarantee a defendant the right to cross-examine himself as to his own statements." United States v. Laffety, 387 F. Supp. 2d 500, 511 (W.D. Pa 2005) (Gibson, J.) rev'd on other grounds 503 F.3d 293, 307 (3d Cir. 2007).

## 2. Claims 2 and 3: Ineffective Assistance of Counsel

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  Id.

The second prong requires a petitioner to demonstrate that counsel's errors deprived him or her of a fair trial and the result was unfair or unreliable.  Id.  To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694.  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.  Id.  It is well established that the test for ineffective assistance of counsel under Pennsylvania law is identical to the Strickland test. See Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2003).

a.  Claim 2: Probable Cause

In Claim 2, Petitioner alleges that prior counsel was ineffective for failing to preserve a probable cause challenge to his July 21, 2000, warrantless arrest after initially pursuing a pre-trial suppression hearing.  In its opinion explaining its dismissal of this claim, the PCRA trial court held that evidence presented during a suppression hearing prior to Petitioner's criminal

trial, in which the arresting officer testified that he had been informed by other detectives at a squad meeting that an eye-witness named Donta Wilson had stated that Petitioner had been involved in the death of Sherdina Jones, had established probable cause for the arrest.  See (Doc 15-5 at 11); see also (Doc. 39 at 54-55).  At the conclusion of the suppression hearing itself, the trial court found that

> the [arresting officers] clearly had probable cause to arrest the [Petitioner] on July 21st because they had an eyewitness account as to the shooting, to identify [Petitioner] being [sic] the shooter of Sherdina Jones . . . and those facts and circumstances at the time of the arrest would justify a reasonably prudent person that a crime had been committed and that [Petitioner] was the probable perpetrator."

(Doc. 39 at 181-82).

In affirming the decision of the PCRA trial court, the Superior Court held that "[t]he totality of the circumstances demonstrate[d] probable cause to support [Petitioner's] warrantless arrest."  (Doc. 15-8 at 19).  It appears from the record that, unlike the PCRA trial court, the Superior Court did not have a transcript of the suppression hearing before them when it adjudicated Petitioner's PCRA appeal.  (Doc. 15-8 at 18).  However, that court noted that Petitioner conceded in his brief that police had an eyewitness statement accusing Petitioner of committing the shooting.  Id. at 18; see also Pet.'s PCRA Ap. Ct. Br. (Doc. 15-6 at 47).  Additionally, Petitioner conceded in that same brief that the eyewitness's accusation had been relayed to the arresting officer during a squad meeting.  (Doc. 15-6 at 47).

The Superior Court also based its affirmance of the finding of probable cause on the trial testimony of Officer Amoroso, who had heard Petitioner state, just hours before Sherdina Jones

was shot to death on Kelly Street, that "Kelly Street" was responsible for an earlier shooting, of which he was the apparent target, and that "[s]omebody [was] going to pay. . . ." (Doc. 15-8 at 18-19); see also Trial Tr. of Jan 12-16, 2001 at 93, 97. This report was filed by Officer Amoroso on July 7, 2000 – two weeks prior to Petitioner's warrantless arrest on July 21, 2000. Id. at 103. As Petitioner properly notes, nowhere in the record does it indicate explicitly that that Petitioner's statement regarding his excited utterance that "Kelly Street" was responsible for the shooting on July 3, 2000, or that someone would pay for that shooting, was ever relayed to the arresting detective, either through Officer Amoroso's report or otherwise.

The Fourth Amendment states, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." In the context of a warrantless arrest, it is well-established that the standard is "whether, at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge and of which [he or she] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 85, 91 (1964). While "[p]robable cause to arrest requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995). In order to determine whether probable cause existed, a court must apply a "common sense approach" based on the totality of the circumstances. Pfaff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000) (internal citations omitted). As such, this Court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an

objectively reasonable police officer, amount to' probable cause." <u>Maryland v. Pringle</u>, 540 U.S. 366, 371, (2003) (quoting <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996)).

"[I]n making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." <u>Illinois v. Gates</u>, 462 U.S. 213, 242 (1983) (internal quotation marks omitted). "[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." <u>Id.</u> at 230. An informant who relates his or her information to a law enforcement officer during an in-person meeting is more reliable than an anonymous caller. <u>United States v. Valentine</u>, 232 F.3d 350, 354 (3d Cir. 2000). The corroboration of an informant's tip by independent police work enhances the value of an informer's tip. <u>Gates</u>, 462 U.S. at 241-42. However, courts have recognized that "[p]olice are entitled to base an arrest on a citizen complaint, whether of a victim . . . or a nonvictim witness, without investigating the truthfulness of the complaint, unless . . . they have reason to believe it's fishy." <u>See Guzell v. Hiller</u>, 223 F.3d 518, 519-20 (7th Cir. 2000) (citing cases); <u>see also United States v. Hammond</u>, 666 F.2d 435, 439 (9th Cir. 1982). Furthermore, the level of detail provided by a citizen-informant is a factor to be considered when deciding whether probable cause existed to support a warrantless arrest. <u>See United States v. Daly</u>, 937 F. Supp. 401, 408 (E.D. Pa 1996); <u>see also United States v. Drew</u>, 436 F.2d 529, 532 (5th Cir. 1970), <u>cert</u>. <u>denied</u> 402 U.S. 977 (1971). It is improper to discount information provided by an informant simply because he has no proven record of truthfulness or accuracy. <u>United States v. Gagnon</u>, 373 F.3d 230, 236 (2d Cir. 2004) (internal quotes and citations omitted).

Finally, under the "collective knowledge" doctrine, the officer personally effecting the arrest need not have personal knowledge of all facts establishing probable cause. The Supreme Court has clearly held that "where law enforcement officers are cooperating in an investigation, as here, the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 772 n. 5 (1983). Probable cause can rest on the collective knowledge of police where there is evidence of some communication between them, or where they are cooperating in an investigation. O'Connor v. City of Phila., 233 F. App'x 161, 165 (3d Cir. 2007) (citing cases); United States v. Fromal, 733 F. Supp, 960, 968 (E.D. Pa. 1990).

Under this standard, it is clear that probable cause existed at the time of Petitioner's warrantless arrest. This is true even under *de novo* review. While Detective McGee was not privy to whatever conversations took place between Donta Wilson and the detectives that interviewed him, whatever knowledge they had of the circumstances surrounding the case was imputed on him under the collective knowledge doctrine. Those detectives were presented with information from an identified individual who was a non-victim witness to Ms. Jones's murder, who described seeing Petitioner drive to the scene of the crime, stop his car, aim a long-barreled gun out of the window of his car and open fire. (Doc. 39 at 71). Wilson identified petitioner by name as the shooter, and even described the sound of the gunfire as "smaller pops," which is consistent with the sound made by .22 rifle. Id. Even if the information in Officer Amoroso's report relating Petitioner's statements regarding "Kelly Street's" responsibility for an earlier shooting, for which someone would pay, were not to be imputed on the arresting officer, the information in Donta Wilson's statement alone contained sufficient indicia of reliability to establish probable cause at the time of arrest.

As a result of the above analysis, it is not reasonably probable that any preservation or further litigation by counsel of this issue would have led to a different result for Petitioner. Accordingly, this claim will be denied.

b.  Claim 3: Failure to Seek a Mistrial Due to Comments Made by the Prosecution

Petitioner next argues that counsel was ineffective for "failing to seek a mistrial when the prosecutor repeatedly expressed his personal opinion and beliefs about Petitioner's guilt and credibility. . . ."  (Doc. 21 at 18).  Petitioner raised this issue in his PCRA proceedings, identifying in his brief to the Superior Court four statements made by the prosecution, which allegedly were expressions of "highly prejudicial and improper personal beliefs about [Petitioner's] guilt and credibility."  (Doc. 15-6 at 37).  These statements were:

(1)      "[Petitioner] wasn't telling the detective the truth and he wasn't telling the truth. . . ."  Trial Tr. of Jan 18-19, 2001 at 67.

(2)      "[T]he [Petitioner's] suggestion to you that he heard shots is not reasonable and it is a self-serving declaration. . . ."  Id. at 66

(3)      "[Petitioner] knew what he did was wrong and was not justified."  Id.

(4)      The prosecution asserted that it was his job to seek truth and justice.  Id. at 72.

Petitioner raised this argument with respect to each statement individually, as well as in the aggregate.  (Doc. 15-6 at 37).

In affirming the PCRA trial court's dismissal of this claim, the Superior Court noted that it had "carefully reviewed the entirety of the prosecutor's closing argument[,]" and it found only one statement "which could even arguably be construed as a personal opinion."  (Doc. 15-8 at

16) This was that Petitioner "knew what he did and he knew what he did was wrong and was not justified." Trial Tr. of Jan. 18-19, 2001 at 66. However, that court held that a review of the context in which the statement was made shows that it actually was an attempt to rebut Petitioner's theory of self-defense, which, under Pennsylvania law, requires a defendant to harbor a reasonable belief of immediate necessity. (Doc. 15-8 at 16); 18 Pa. Cons. Stat. § 505(a). A review of the portions of the trial transcript surrounding the prosecution's statement demonstrates that this is a reasonable characterization.

As the Superior Court noted, the trial judge issued cautionary instructions to the jurors, informing them that "the attorneys' opinions are just that[,]" and that they were without evidentiary value. (Doc. 15-8 at 15); Trial Tr. of Jan. 18-19, 2001 at 68. As a general rule, a jury is presumed to have followed a judge's instructions. Cf. Richardson v. Marsh, 481 U.S. 200, 211 (1987) (discussing this presumption in the context of an alleged violation of the Confrontation Clause). Petitioner provides no evidence whatsoever that the jury failed to adhere to these instructions, nor is there any indication that he was denied a fair trial. As such, Petitioner cannot show prejudice due to counsel's failure to seek a mistrial, and the undersigned is unpersuaded that, had counsel done so, there is a reasonable probability that the outcome of Petitioner's trial would have been different. Accordingly, this claim will be denied.

### 3. Claim 5: After-Discovered Evidence

Finally, Petitioner argues that the affidavits of six individuals, purportedly discovered by him after the conclusion of his criminal trial, create reasonable doubt with respect to his conviction for first degree murder. See (Doc 15-10 at 36-57). The PCRA trial court denied

Petitioner an evidentiary hearing on this issue, and dismissed the claim. (Doc. 15-5 at 2-3). The Superior Court affirmed for reasons of state law, and noted explicitly that there was no indication on the record that the identity of Donta Wilson – one of the affiants, and the individual who initially informed police of Petitioner's involvement in the shooting – ever was suppressed by the prosecution. (Doc. 15-8 at 7-13). Plaintiff explicitly contends that the state court's refusal to grant a hearing on this claim violated his rights under the Fourteenth Amendment, as well as his Sixth Amendment right to compulsory process. (Doc. 21 at 21). Presuming, without deciding, that Petitioner has exhausted this claim before the state courts, the undersigned will address it on the merits. See 28 U.S.C. § 2254(b)(2).

It is clear that Petitioner bases his claim for relief on the theory that the evidence in these affidavits would "demonstrate[] [P]etitioner's innocence as to first degree murder, and . . . would have led to his acquittal of such or at the very least, to a conviction of a lesser grade of homicide." (Doc. 4 at 54). While a credible claim of actual innocence can act as a "gateway" through which a habeas petitioner may pass to have an otherwise procedurally barred constitutional claim considered on the merits, see Schlup v. Delo, 513 U.S. 298 (1995), a stand-alone claim of actual innocence must be denied because it is not cognizable in federal habeas. Herrera v. Collins, 506 U.S. 390 (1993).

In Herrera, the Supreme Court explained that once a defendant is found guilty after a fair trial in the state court, he no longer is entitled to a presumption of innocence, and thus comes before the federal habeas court not as one who is innocent, but as a convicted criminal. 506 U.S. at 399-400. Because such a determination in the state criminal trial is "a decisive and portentous event" and "[s]ociety's resources have been concentrated at that time and place in order to

decide, within the limits of human fallibility, the guilt or innocence of one of its citizens," freestanding claims of actual innocence are not reviewable in federal habeas actions. Id. at 401 (internal quotations and citations omitted). The Court noted that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." Id. at 400. "Federal courts are not forums in which to relitigate state trials." Id. at 401 (quotations and citation omitted). Thus, the Court rejected Herrera's claim that, even if the proceedings that resulted in his conviction and sentence were entirely fair and error free, his innocence would make his execution a constitutionally intolerable event.

Based upon the Herrera decision, the Court of Appeals for the Third Circuit repeatedly has emphasized that in non-capital cases such is this case: "[i]t has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004), quoting Herrera, 506 U.S. at 400; Albrecht v. Horn, 485 F.3d 103, 121-22 (3d Cir. 2007); Johnson v. Sobina, No. 08-262 Erie, 2011 WL 1790053, at *6 (W.D. Pa. Mar. 30, 2011), report adopted by 2011 WL 1752082, at *1 (W.D. Pa. May 9, 2011). Thus, Petitioner's stand-alone claim of actual innocence is not cognizable under the federal habeas corpus statute, and will be denied.[3]

---

[3] Recently, in District Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52, 129 S.Ct. 2308 (2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court in dicta assumed without deciding that an actual innocence claim could be brought in habeas, but noted "the high standard any claimant would have to meet" to succeed with such a claim. Id. at 2321 (internal citations omitted). Suffice it to say that if indeed an actual innocence claim could be brought in a non-capital federal (continued . . .)

Petitioner also argues that his Sixth Amendment right to compulsory process was somehow violated with respect to this evidence. Courts have recognized that "[f]ew rights are more fundamental that that of an accused to present witnesses in his own defense." <u>Chambers</u>, 410 U.S. at 302 (internal citations omitted). This right, of course, is not unlimited a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." <u>Id.</u>; <u>see also</u> <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988) ("[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence").

The Compulsory Process Clause of the Sixth Amendment "protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling from the trial judge." <u>Mills</u>, 956 F.2d at 445. As stated above in Part III.B.2.a, <u>supra</u>, the Court of Appeals for the Third Circuit has established a three-prong test for determining whether a limitation on the right to present a witness rises to the level of a constitutional violation: "First, that [defendant] was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose." <u>Id.</u> at 446.

In the case at bar, Petitioner has failed to show any interference with the presentation of these witnesses at his criminal trial whatsoever. The record does not indicate that he ever attempted to call them, and, indeed, in his brief he provides detailed information as to why their

---

habeas case, Petitioner has fallen far short of offering the quality of new evidence of innocence that would entitle him to habeas relief.

testimony was unknown or unavailable to him at trial.[4]  (Doc. 4 at 48-49).  As such, Petitioner's

Compulsory Process Clause claim will be denied.  Additionally, to the extent that Petitioner

attempts to base this claim on the PCRA trial court's denial of an evidentiary hearing, it will be

denied.  It is well established that errors that occur during a state collateral proceeding are not

cognizable under section 2254.  See, e.g., Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir.

1998) ("The federal role in reviewing an application for habeas corpus is limited to evaluating

what occurred in the state or federal proceedings that actually led to the petitioner's conviction;

what occurred in the petitioner's *collateral* proceeding does not enter into the habeas

calculation. . . .  Federal habeas power is limited . . . to a determination of whether there has been

an improper detention by virtue of the state court judgment.") (citing cases, emphasis in original,

and internal quotes and citations omitted).


**V.  Certificate of Appealability**

A certificate of appealability will be denied, as Petitioner has failed to make "a

substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).

An appropriate order will follow.

---

[4] Petitioner argues in his brief that the testimony contained in the affidavits at issue "could not
have been discovered before trial by the exercise of due diligence."  (Doc. 4 at 48).  He goes on
to explain in detail why this is true for each affiant.  Id. at 49.  These concessions would cause
any ineffective assistance of counsel claim with respect to these affidavits – to the extent that one
is made – to fail as well.

Dated:  December 27, 2011                    BY THE COURT:

                                             s/Cathy Bissoon
                                             CATHY BISSOON
                                             UNITED STATES DISTRICT JUDGE




cc:
**JASON MICHAEL FRAZIER**
EM7522
165 SCI Lane
Greensburg, PA 15601

Counsel of record